CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

5/6/2025
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF VIRGINIA
### Lynchburg Division

| | |
|---|---|
| TIFFANY BANKS, on behalf of herself and her minor child L.I., JASMINE ALLEN, TINA ROBINSON, and TIERA TRENT, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HORIZON BEHAVIORAL HEALTH., <br><br> Defendant. | Case No.:  6:25cv00038 <br><br> CLASS ACTION COMPLAINT <br><br> DEMAND FOR JURY TRIAL |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs ("Plaintiffs") Tiffany Banks on behalf of herself and her minor child L.I., Jasmine Allen, Tina Robinson, and Tiera Trent, individually and on behalf of all others similarly situated, sue Defendant Horizon Behavioral Health, ("Horizon" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1.      This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII") and protected health information ("PHI" collectively, the "Private Information") of Plaintiffs and other current and former patients of Defendant, the putative class members ("Class").

2.      The Private Information compromised in the Data Breach included certain personal identifying information of Defendant's patients, including the Plaintiffs. This Private Information included but is not limited to demographic information (such as names and Social Security numbers), clinical information (such as diagnosis/conditions), and/or information related to insurance or claims information. [1]

3.      The Private Information was acquired by cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals.

4.      According to Defendant's report to the US Department of Health and Human Services, a total of 49,822 individuals were affected.[2]

5.      The Data Breach resulted from Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted for either treatment.

6.      Plaintiffs bring this class action lawsuit on behalf of themselves, Plaintiff's Banks's minor child and those similarly situated, to address Defendant's inadequate safeguarding of Private Information that they collected and maintained from the Class Members.

7.      Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

---

[1] *See* Notice of Data Breach, Exhibit A.
[2] US Department of Health and Human Services Office for Civil Rights, Breach Portal, Cases Currently Under Investigation, *available at* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (*last accessed* May 5, 2025).

8.      Defendant, through its employees, disregarded the rights of Plaintiffs, their minor children, and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendant also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

9.      In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant's employees (presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

10.      Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

11.      Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes, including, but not limited to: opening new financial accounts in Class Members' names; taking out loans in Class Members' names; using Class Members' information to obtain government benefits; filing false medical claims using Class Members' information; obtaining driver's licenses in Class Members' names but with another person's photograph; and/or giving false information to police during an arrest.

12.      Because of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13.    Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.    Through this Complaint, the Plaintiffs seek to remedy these harms on behalf of themselves, their minor children, and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15.    Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

16.    Accordingly, Plaintiffs sue Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of implied contract, (iv) breach of fiduciary duty; and (v) unjust enrichment.

## II.  PARTIES

17.    Plaintiff Jasmine Allen is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Lynchburg.

18.    Plaintiff Tina Robinson is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Pamplin.

19.    Plaintiffs Tiffany Banks, and her minor child L.I., are and at all times mentioned here in were individual citizens of Virginia, residing in the city of Lynchburg.

20.    Defendant Horizon Behavioral Health is a non-profit professional organization with its principal place of business located at 2215 Langhorne rd. Lynchburg, Virginia 24501.

21.    Defendant can be served by serving its senior officer, Melissa Lucy, at its principal place of business.

### III.  JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is at least 49,822 and at least one Class member is a citizen of a state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23.     This Court has general personal jurisdiction over Defendant because Defendant is a business entity that is authorized to transact business in Virginia and has its principal place of business in Virginia.

24.     Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendant conducts business in this District and because a substantial part of the acts or omissions giving rise to this action occurred within this District.

### IV.  FACTUAL ALLEGATIONS

*A.  DEFENDANT'S BUSINESS*

25.     Defendant is a provider of mental health; substance use and intellectual disability services in Central Virginia.[3]

26.     In the ordinary course of obtaining treatment from Defendant, each prospective patient must provide (and Plaintiffs did provide) Defendant with sensitive, personal, and private information, such as their:

- Government ID information;

- Insurance Information;

- Proof of Income;

---

[3] Horizon Behavioral Health, About Us, All About Us, *available at*: https://www.horizonbh.org/about-us/ (last visited May 5, 2025)

- Social Security number; and

- Guardianships documentation.[4]

27.    All of Defendant's employees, staff, entities, sites, and locations may share employee information with each other for various purposes, as should be disclosed in a data HIPAA compliant privacy notice ("Privacy Policy") that Defendant is required to maintain.[5]

28.    Upon information and belief, Defendant's HIPAA Privacy Policy is provided to every patient prior to receiving treatment and upon request.

29.    Upon information and belief, Defendant made promises and representations to its patients, including Plaintiffs and Class Members, that the PHI and PII collected from them as a condition of the provisions of healthcare services would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

30.    In Defendant's privacy policy, they admit that every time the Plaintiffs and Class members receive services from Horizon, Defendant makes a record of the contact including, but not limited to, written assessments, individual service plans, progress notes, diagnoses, treatment records, correspondence, and transition or discharge plans.[6] Upon signing the Defendant's Consent to Treatment form, Plaintiffs' agreed to allow Defendant to use or share their medical information to provide them with treatment or medical services.[7]

---

[4] Horizon Behavioral Health, About Us *available at:* https://www.horizonbh.org/admissions/ (last visited May 5, 2025)

[5] Horizon Behavioral Health, Privacy Policy *available at*: https://www.horizonbh.org/privacy-policy/ (last visited May 5, 2025).

[6] *Id.*

[7] *Id*.

31.     Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

32.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PHI and PII. Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class members value the confidentiality of their PHI and PII and demand security to safeguard their PHI and PII.

33.     Defendant had a duty to adopt reasonable measures to protect the PHI and PII of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep its patients PHI and PII safe and confidential.

34.     Defendant had obligations created by FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their PHI and PII confidential and to protect it from unauthorized access and disclosure.

35.     Defendant agreed to and undertook legal duties to maintain the Private Information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, regulations, and industry standards.

36.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PHI and PII. Without the required submission of PHI and PII, Defendant could not perform the services it provides.

37.     The patient information held by Defendant in its computer system and network included the Private Information of Plaintiff and Class Members.

38.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PHI and PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiffs' and Class Members' PHI and PII from disclosure.

## B.  THE DATA BREACH

39.     A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant. Cyberattacks involve compromising an electronic information system using software or computer technology.[8]

40.     On and around April 21, 2025, Defendant sent Plaintiffs Allen, Robinson, and Banks *et al*., a letter notifying them that their Private Information was exposed as a result of a Data Breach.[9] Those letter stated in part:

> **What Happened?**
>
> On March 16, 2025, Horizon discovered issues with our computer systems and quickly determined we were the victim of a ransomware incident. We immediately took steps to stop the ransomware and engaged outside cybersecurity experts to investigate this event. Based on their investigation, it appears the incident began on or around March 13, 2025. Between March 13, 2025 and March 16, 2025, information from Horizon's systems may have been inappropriately accessed and/or obtained by an unauthorized user.
>
> **What Information was Involved?**
>
> …
>
> In particular, our impacted systems store the following types of information: demographic information (such as your name, social security number, address, ZIP code, driver's license number, date of birth, or similar identifier), clinical information (which may include diagnosis/conditions,

---

[8] *See* Identity Theft Resource Center, *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited May 5, 2025).
[9] *See* Exhibit A, Notice of Breach.

medications, or other treatment information), or information related to insurance or claims information.[10]

41.     Omitted from the letter was the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their PII remains protected.

42.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

43.     Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the letter, including:

- This Data Breach was the work of cybercriminals;

- The cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data); and

- Once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Private Information for download and theft.

44.     In the context of the letter, Defendant's use of the phrase "may have been" is misleading lawyer language. Companies only send notice letters because data breach notification

---

[10] *See* Exhibit A, Notice of Breach.

laws require them to do so. And such letters are only sent to those persons who Defendant itself has a reasonable belief that such personal information was accessed or acquired by an unauthorized individual or entity. Defendant cannot hide behind legalese – by sending a notice of data breach letter to Plaintiffs and Class members, it admits that Defendant itself has a reasonable belief that Plaintiffs' and Class Members' names, personal identifying information, and protected health information were accessed or acquired by an unknown actor – aka cybercriminals.

45.     Moreover the Defendant has reported that 49,822 individuals were impacted by this breach.[11] However, it failed to report whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their Data.

46.     Defendant had obligations created by HIPAA, contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

47.     Defendant's mailed notice was dated April 21, 2025 more than one month after Defendant discovered the Data Breach.

48.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PHI and PII, such as encrypting the information or deleting it when it is no longer needed.

---

[11] US Department of Health and Human Services Office for Civil Rights, Breach Portal, Cases Currently Under Investigation, *available at* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (*last accessed* May 5, 2025).

49.    The attacker(s) targeted, accessed, and acquired files in Defendant's computer systems containing unencrypted PHI and PII of Plaintiffs and Class Members, including their names and Social Security numbers, Medical information, and Health Insurance information. Plaintiff's and Class Members' PHI and PII was accessed and stolen in the Data Breach.

50.    Plaintiffs further believe their PHI and PII and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks.

## C. DATA BREACHES ARE PREVENTABLE

51.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PHI and PII.

52.    Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

53.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known or should have been widely known to the public and to anyone in Defendant's industry, including Defendant.

54.    As explained by the Federal bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[12]

55.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United State Government, the following measures:

---

[12] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited May 5, 2025).

11

a.      Implement an awareness and training program, because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b.      Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c.      Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d.      Configure firewalls to block access to known malicious IP addresses.

e.      Patch operating systems, software and firmware on devices. Consider using a centralized patch management system.

f.      Set anti-virus and anti-malware programs to conduct regular scans automatically.

g.      Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h.      Configure access controls – including file, directory and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i.      Disable macro scripts from office files transmitted via email. Consider using office viewer software to open Microsoft Office Files transmitted via email instead of full office suite applications.

j.      Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations such as temporary folders supporting popular internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k.      Consider disabling remote Desktop protocol (RDP) if it is not being used.

l.      Us application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m.      Execute operating system environments or specific programs in a virtualized environment.

n.      Categorize data based on organization value and implement physical and logical separation of networks and data for different organizational units.[13]

56.    To prevent and detect cyber attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

- Apply latest security updates

- Use threat and vulnerability management

---

[13] *Id.* at 3-4.

- Perform regular audits; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among security operations, security admins, and information technology admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use multifactor authentication or network level authentication and use strong randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden Infrastructure**

- Use windows defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection

- Turn on attack surface reduction rules and Antimalware Scan Interface for Office (Visual Basic Applications).[14]

57.    Given that Defendant was storing the Private Information of its current and former patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

58.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiffs and Class members.

### D.  DEFENDANT ACQUIRES, COLLECTS & STORES PATIENTS' PRIVATE INFORMATION

59.    Defendant derives a substantial economic benefit from providing medical services to its patients, and as a part of providing that service, Defendant retains and stores Plaintiffs' and Class Members' Private Information.

60.    As a condition of obtaining treatment with Defendant, Defendant requires that prospective, current, and former patients entrust it with highly sensitive personal information.

61.    By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

---

[14] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited May 5, 2025).

62. Plaintiffs and the Class members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

63. Upon information and belief, in the course of collecting Private Information from patients, including Plaintiffs, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.[15]

64. Defendant's patients, including Plaintiffs and the Class members, relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

65. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

66. Upon information and belief, Defendant made promises to Plaintiffs and Class members to maintain and protect Plaintiffs' and Class Members' Private Information, demonstrating an understanding of the importance of securing Private Information.

67. Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**E.  DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE RISK BECAUSE HEALTHCARE PROVIDERS IN POSSESSION OF PRIVATE INFORMATION ARE PARTICULARLY SUSCEPTIBLE TO CYBER ATTACKS.**

---

[15] *See* Horizon Behavioral Health, Privacy Policy *available at*: https://www.horizonbh.org/privacy-policy/ (last visited May 5, 2025).

68.     Defendant's data security obligations were particularly important given the substantial increase in Data Breaches targeting institutions that collect and Store Private Information, Like Defendant, preceding the date of the Data Breach.

69.     Data thieves regularly target institutions like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that private Information through unauthorized access.

70.     In 2024 the number of data compromises reported was 3,158.[16] According to the report, healthcare industry was the second most targeted industry for cyberattacks.[17] In 2023 there were 811 compromises and in 2024 there were 536 compromises of healthcare companies data systems.[18]The types of information exposed in data compromises skewed toward sensitive information with a renewed focus on financial information along with a continued increase in driver's license and health information.[19]

71.     In light of recent high profile data breaches at other healthcare partner and provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023), American medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018, Florida Orthopedic Institute (640,000

---

[16]  *See* Identity Theft Resource Center, *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited May 5, 2025).
[17] *Id.*
[18] *Id*.
[19] *Id.*

patients, July 2020), Defendant knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

72.    As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

73.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class members from being compromised.

74.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen – particularly PHI – fraudulent use of that information and damage to victims may continue for years.

## F.  VALUE OF PRIVATE INFORMATION

75.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." [20]The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

---

[20] 17 C.F.R. § 248.201 (2013).
[21] 17 C.F.R. § 248.201 (2013).

76.     The PII of individuals remains of high value to criminals, as evidence by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. [22] For example, Personal Information can be sold at a price ranging from $40 to $200.[23] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[24]

77.     Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including:

a.     Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud;

b.      Government Identity Theft, including tax refund fraud;

c.     Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" ;

d.     Medical Identity Theft; and

e.     Utility Fraud.[25]

---

[22] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*:  https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/  (last visited May 5, 2025).
[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited May 5, 2025).
[24] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 5, 2025).
[25] https://lifelock.norton.com/learn/identity-theft-resources/kinds-of-id-theft-using-social-security-number     (last visited May 5, 2025)

78.    It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

79.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[26] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[27]

80.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding

---

[26]*See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases. (last accessed May 5, 2025).
[27] *Id.*

payment for items you never bought. Someone illegally using your Social

Security number and assuming your identity can cause a lot of problems.[28]

81. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[29] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[30]

82.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

83.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[31]

84.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard

---

[28] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf  (last accessed May 5, 2025).

[29] *See*  https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last accessed May 5, 2025).

[30] *See* https://www.investopedia.com/terms/s/ssn.asp (last accessed May 5, 2025).

[31] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*:  http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed May 5, 2025).

for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.")

85.    Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[32]

86.    Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[33]

---

[32] *See* https://oag.ca.gov/idtheft/facts/your-ssn
[33] *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at:*    https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited May 5, 2025).

87.    A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[34]

88.    According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

89.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[35] However, this is not the case.  As cybersecurity experts point out:

"It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[36]

90.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[37]

91.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach

---

[34]    https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited on May 5, 2025).
[35]    https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited on May 5, 2025).
[36]    *Id.*
[37]    *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on May 5, 2025).

because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number and name.

92.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[38]

93.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

94.    Even if there is no current fraudulent activity, the fraudulent activity resulting from the Data Breach may not come to light for years. This is because there may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> Law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm. [39]

---

[38] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 5, 2025).

[39] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited May 5, 2025).

95.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### G. Defendant Fails to Comply with FTC Guidelines

96.    The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

97.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[40]

98.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[41]

99.    The FTC further recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious

---

[40] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 5, 2025).
[41] *Id*.

activity on the network; and verify that third-party service providers have implemented reasonable security measures.

100.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

101.    The FTC enforcement actions include actions against employers, like Defendant.

102.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair…practices in or affecting commerce," including as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

103.    Defendant failed to properly implement basic data security practices.

104.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

105.    Upon Information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its patients, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it

obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### H. Defendant Failed to Comply with HIPAA Guidelines

106.    Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

107.    Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

108.    HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

109.    HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

110.    HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

111.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

112.    HIPAA's Security Rule requires defendants to do the following:

        a.       Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

        b.       Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

        c.       Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

        d.       Ensure compliance by its workforce.

113.    HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

114.    HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. §17902.

115.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

116.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

117.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

118.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

119.    Defendant was at all times fully aware of its HIPAA obligations to protect the Private Information of consumers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private

Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### I.  Defendant Fails to Comply with Industry Standards

120.    As shown above, experts studying cyber security routinely identify healthcare companies as being particularly vulnerable to cyberattacks because of the value of the PHI which they collect and maintain.

121.    Several best practices have been identified that a minimum should be implemented by healthcare companies like Defendant, including, but not limited to:

   a.   educating all employees;

   b.   using strong passwords;

   c.   creating multi-layer security, including firewalls,

   d.   antivirus, and anti-malware software;

   e.   encryption, making data unreadable without a key;

   f.   using multi-factor authentication; protecting backup data; and

   g.   limiting which employees can access sensitive data.

122.    Other best cybersecurity practices that are standard in the healthcare industry include:

   a.   installing appropriate malware detection software;

   b.   monitoring and limiting the network ports;

   c.   protecting web browsers and email management systems;

   d.   setting up network systems such as firewalls, switches and routers;

   e.   monitoring and protection of physical security systems;

   f.   protection against any possible communication system; and

g.   training staff regarding critical points.

123.   Defendant filed to follow these cybersecurity best practices, including failure to train staff.

124.   Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

125.   These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### J. Defendant Breached Its Duty to Safeguard Plaintiffs' and Class Members' Private Information

126.   In addition to its obligations under federal laws, Defendant owed duties to plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class members.

127.   Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer

systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.   Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.   Failing to adequately protect employees' Private Information;

    c.   Failing to properly monitor its own data security systems for existing intrusions;

    d.   Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

    e.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

    f.   Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

128.   Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems, which contained unsecured and unencrypted Private Information.

129.   Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems, and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

**K.  Common Injuries and Damages**

130.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PHI and PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PHI and PII; (iii) lost or diminished value of PHI and PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PHI and PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PHI and PII.

### L.  The Data Breach Increases Victims' Risk of Identity Theft

131.    The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

132.    Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

133.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other

criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

134.    Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

135.    Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[42]

136.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[43]

137.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[44] Accordingly, since Social Security numbers are frequently used

---

[42] *See* N.C. Gen. Stat. § 132-1.10(1).
[43]    *See*    https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers    (last accessed May 5, 2025).
[44]    *See*    https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/ (last accessed May 5, 2025).

to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[45]

138.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[46]

139.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

140.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[45] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last accessed May 5, 2025).
[46] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last accessed May 5, 2025).

141.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

142.    Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

143.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***M. Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

144.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

145.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, changing passwords and resecuring their own computer networks, and signing up for the credit monitoring insurance services offered by Defendant. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

146.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in

which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[47]

147.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[48]

148.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[49]

## N.  Diminution of Value of Private Information

149.    PII/PHI is a valuable property right.[50] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[47] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf. (last accessed May 5, 2025).

[48] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited May 5, 2025).

[49]  *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf. (last accessed May 5, 2025).

[50] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted). (last visited May 5, 2025).

150.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[51]

151.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[52]

152.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[53]

153.    Theft of PHI is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[54]

154.    As a result of the Data Breach, Plaintiffs' and Class members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

155.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the

[51] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed May 5, 2025).
[52] https://datacoup.com/ (last accessed May 5, 2025).
[53]    Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel. nielsen.com/ui/US/en/faqen.html. (last accessed May 5, 2025).
[54]    *Medical    I.D.    Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report %20may%20be%20affected. (last visited May 5, 2025).

foreseeable consequences that would occur if their data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

156.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### O.  Future Costs of Credit and Identity Theft Monitoring are Reasonable and Necessary

157.    Given the type of targeted attack, there is a strong probability that entire batches of stolen information have been placed or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PHI and/or PII for identity theft crimes – *e.g.,* opening bank accounts in the victims' names to make purchases or to lander money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

158.    Such fraud may go undetected until debt collection calls commence months, or even years, later.

159.    An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

160.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

161.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

162.    The great efficiency of electronic records brings the risk of privacy breaches. These electronic records contain a lot of sensitive information that is valuable to cybercriminals. One patients' complete record can be sold for hundreds of dollars on the dark web. As such, PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the Defendant's industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

163.    Based on the foregoing, the information comprised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information comprised in this Data Breach is impossible to "close" and difficult, if not impossible, to change – names and dates of birth.

164.    Defendant was always fully aware of its obligation to protect the PII and PHI of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

## V.  PLAINTIFF'S EXPERIENCE

### A. PLAINTIFF ALLEN'S EXPERIENCE

165.    Plaintiff Jasmine Allen is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Lynchburg.

166.    Plaintiff provided Defendant with his sensitive PII to obtain treatment as a patient of Defendant.

167.    Plaintiff is currently a patient of Defendant and has been a patient for multiple years.

168.    Plaintiff received notice of the Data Breach in April of 2025, informing her that her sensitive information was part of Defendant's Data Breach.

169.    Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard her Private Information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to the same. Plaintiff would not have provided her Private Information to Defendant had she known that the Defendant would not take reasonable steps to safeguard it.

170.    Plaintiff is careful about sharing her sensitive Private Information.

171.    Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

172.    Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her sensitive online accounts.

173.    Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

174.    Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect her Private Information and otherwise mitigate her damages.

175.    Even with the best response, the harm caused to Plaintiff cannot be undone.

176.    Plaintiff is especially alarmed by the type of PHI and PII exposed and/or stolen in the Data Breach. Plaintiff provided Defendant with her most sensitive personal and medical information and cannot be sure how much of it was exfiltrated.

177.    Plaintiff knows that cybercriminals often sell Private Information, and that her PHI and/or PII could be abused months or even years after a data breach.

178.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

179.    Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

180.    Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

**B.  PLAINTIFF ROBINSON'S EXPERIENCE**

181.    Plaintiff Tina Robinson is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Pamplin.

182.    Plaintiff provided Defendant with her sensitive PII to obtain treatment as a patient with Defendant.

183.    Plaintiff received notice of the Data Breach in April of 2025, informing her that his sensitive information was part of Defendant's Data Breach.

184.    Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard her Private Information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to the same. Plaintiff would not have provided her Private Information to Defendant had she known that Defendant would not take reasonable steps to safeguard it.

185.    Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

186.    Plaintiff stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her sensitive online accounts.

187.    Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

188.    Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect her Private Information and otherwise mitigate his damages.

189.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among other things, monitoring his accounts for fraudulent activity.

190.    Even with the best response, the harm caused to Plaintiff cannot be undone.

191.    Plaintiff is especially alarmed by the type of stolen PHI and PII exposed in the Data Breach. Plaintiff provided Defendant with her most sensitive personal and medical information and cannot be sure how much of it was exfiltrated.

192.    Plaintiff knows that cybercriminals often sell Private Information, and that her PHI and PII could be abused months or even years after a data breach.

193.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

194.    Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

195.    Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### C.  PLAINTIFF BANKS AND L.I.'S EXPERIENCES

196.    Plaintiff Tiffany Banks and her minor child L.I. are and at all times mentioned herein were individual citizens of Virginia, residing in the city of San Diego.

197.    Plaintiff provided Defendant with her minor child's sensitive PII and PHI to receive healthcare services from Defendant. Plaintiff received notice of the Data Breach in April of 2025, informing her that her child's sensitive information was part of Defendant's Data Breach.

198.    Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard her child's Private Information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to the same. Plaintiff would not have provided her minor child's Private Information to Defendant had he known that Defendant would not take reasonable steps to safeguard it.

199.    Plaintiff is careful about sharing sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

200.    Plaintiff stores any documents containing sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for sensitive online accounts.

201.    Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted the personal data to Defendant.

202.    Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect her and her child's Private Information and otherwise mitigate their damages.

203.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate damages by, among other things, monitoring accounts for fraudulent activity.

204.    Even with the best response, the harm caused to Plaintiff cannot be undone.

205.    Plaintiff is especially alarmed by the type of stolen PII exposed in the Data Breach. Plaintiff provided Defendant with his most sensitive personal and medical information and cannot be sure how much of it was exfiltrated.

206.    Plaintiff knows that cybercriminals often sell Private Information, and that their PII and her child's PHI could be abused months or even years after a data breach.

207.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of their Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

208.    Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

209.    Plaintiff has a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### D.  PLAINTIFF TRENT'S EXPERIENCE

210.    Plaintiff Tiera Trent is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Appomattox.

211.    Plaintiff provided Defendant with her sensitive PII to obtain treatment as a patient of Defendant. Plaintiff is currently a patient of Defendant.

212.     Plaintiff received notice of the Data Breach in April of 2025, informing her that her sensitive information was part of Defendant's Data Breach.

213.    Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard her Private Information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to the same. Plaintiff would not have provided her Private Information to Defendant had she known that Defendant would not take reasonable steps to safeguard it.

214.    Plaintiff is careful about sharing her sensitive Private Information.

215.    Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

216.    Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her sensitive online accounts.

217.    Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

218.    Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect her Private Information and otherwise mitigate her damages.

219.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among other things, monitoring her accounts for fraudulent activity.

220.    Even with the best response, the harm caused to Plaintiff cannot be undone.

221.    Plaintiff is especially alarmed by the type of stolen PHI and PII exposed in the Data Breach. Plaintiff provided Defendant with her most sensitive personal and medical information and cannot be sure how much of it was exfiltrated.

222.    Plaintiff knows that cybercriminals often sell Private Information, and that her PHI and PII could be abused months or even years after a data breach.

223.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to

Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

224.    Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

225.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

## VI.    PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

226.    To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 12 months of inadequate identity monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

227.    The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

228.    Defendant's credit monitoring advice to Plaintiffs and Class Members places the burden on Plaintiffs and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

229.    Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

230.    Plaintiffs' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

231.    Plaintiffs were damaged in that his Private Information is in the hands of cyber criminals.

232.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

233.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

234.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

235.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

236.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

237.    Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

238.    Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

239.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.  Finding fraudulent charges;

b.  Canceling and reissuing credit and debit cards;

c.  Purchasing credit monitoring and identity theft prevention;

d.  Addressing their inability to withdraw funds linked to compromised accounts;

e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.  Placing "freezes" and "alerts" with credit reporting agencies;

g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.  Contacting financial institutions and closing or modifying financial accounts;

i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.   Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

240.   Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

241.   Further, because of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

242.   As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII.   CLASS ACTION ALLEGATIONS
## VIII.

243.   Plaintiffs brings this action on behalf of himself and on behalf of all other persons similarly situated.

244.   Plaintiff proposes the following Class definition, subject to amendment as appropriate:

**All persons whose Private Information was compromised because of the March 2025 Data Breach (the "Class").**

245.     Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

246.     Plaintiffs reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery. The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

247.     <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but Defendant has provided notice to the Health and Human Services Office of Civil Rights that 49,822 individuals were affected.

248.     <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.   Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e.  Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.  Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.  Whether Plaintiffs and Class Members suffered legally cognizable damages from Defendant's misconduct;

i.  Whether Defendant's conduct was negligent;

j.  Whether Defendant's conduct was per se negligent;

k.  Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

l.  Whether Defendant was unjustly enriched;

m.  Whether Defendant failed to provide notice of the Data Breach promptly; and

n.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

249.  <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other

Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

250.    <u>Adequacy</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

251.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

252.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

253.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

254.    Likewise, issues that will arise in this case are appropriate for certification under Rule 23 because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

    a.    Whether Defendant failed to timely notify the public of the Data Breach;

    b.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.    Whether Defendant's security measures to protect their data systems were reasonable considering best practices recommended by data security experts;

    d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

255.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## IX.   CAUSES OF ACTION
### FIRST COUNT

## NEGLIGENCE
### (On Behalf of Plaintiff and All Class Members)

256.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

257.    Defendant required Plaintiffs and Class Members to submit non-public personal information to obtain employment.

258.    By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

259.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

260.    Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and its employees, which is recognized by laws and regulations, as well as common law. Defendant could ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

261.    Defendant's duty to use reasonable security measures required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

262.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

263.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

264.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of its networks and systems;

c.    Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to detect timely that Class Members' Private Information had been compromised;

f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.    Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

265.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

266.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

267.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

268.    Defendant's negligent conduct is ongoing, in that they still hold the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

269.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## SECOND COUNT
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and All Class Members)

270.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

271.    Under the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

272.    Defendant breached its duties to Plaintiffs and Class Members under the Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

273.    Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

274.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

275.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that by failing to meet its duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

276.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

### THIRD COUNT
### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and All Class Members)

277.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

278.    When Plaintiffs and Class Members provided their Private Information to Defendant in exchange for Defendant's employment, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

279.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

280.    In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and adhered to industry standards.

281.    Plaintiffs and Class Members entered into employment with Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

282.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

283.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

284.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

285.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

286.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

287.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

288.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOURTH COUNT**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and All Class Members)**

289.     Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

290.     Defendant became guardian of Plaintiffs' and Class Members' Private Information, creating a special relationship between Defendant and Plaintiffs and Class Members.

291.     As such, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

292.     Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its patients, in particular, to keep secure their Private Information.

293.     Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

294.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

295.     Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

296.     As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

    a.   actual identity theft;

    b.   the compromise, publication, and/or theft of their Private Information;

    c.   out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

    d.   lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

    e.   the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

    f.   future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the rest of the lives of Plaintiff and Class Members; and

    g.   the diminished value of Defendant's services they received.

297.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**FIFTH COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and All Class Members)**

298.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

299.    Plaintiffs brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

62

300.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

301.    As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the portion of each payment made that is allocated to data security is known to Defendant.

302.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. They bought goods from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the services that were the subject of the transaction and had their Private Information protected with adequate data security.

303.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

304.    Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

305.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed

to implement appropriate data management and security measures that are mandated by industry standards.

306.    Defendant failed to secure Plaintiffs' and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiffs and Class Members provided.

307.    Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

308.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

309.    Plaintiffs and Class Members have no adequate remedy at law.

310.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

    a.  actual identity theft;

    b.  the loss of the opportunity of how their Private Information is used;

    c.  the compromise, publication, and/or theft of their Private Information;

    d.  out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

    e.  lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

    f.   the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

    g.   future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

311.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

312.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the minor child and the Class described above seeks the following relief:

    a.   For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the Class, and finding that Plaintiffs are a proper representative of the Class requested herein;

    b.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of

Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e. Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

## XI.  JURY TRIAL DEMANDED

Plaintiffs demands a trial by jury on all claims so triable.

Dated: May 6, 2025

Respectfully submitted,

*/s/Seth R. Carroll*
Seth R. Carroll
Virginia Bar No. 74745
scarroll@hurtinva.com
**Commonwealth Law Group**
3311 West Broad St.
Richmond, VA 23230
(804) 999-9999

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Service only: service@eksm.com

**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**

(* denotes *pro hac vice* forthcoming)